UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

SECRETARY OF LABOR, UNITED
STATES DEPARTMENT OF LABOR,

    Plaintiff,

v.                                              Case No: 6:12-cv-1100-Orl-18TBS

AMERICAN BRONZE FOUNDRY, INC.,
CHARLES WAMBOLD, RENEE
WAMBOLD and JENNIFER
SCHIFFERMILLER,

    Defendants.

## REPORT AND RECOMMENDATION[1]

Pending before the Court is Defendants' Motion to Enforce Settlement and For Sanctions. (Doc 22). Upon due consideration, I respectfully recommend that the motion be DENIED.

### I. Background

This case arises out of the discharge of Kyna Kalinowski (formerly Kyna Smith) from her employment at Defendant American Bronze Foundry, Inc. ("American Bronze"). On April 5, 2010, Kalinowski filed an anonymous workplace safety complaint with the Occupational Safety and Health Administration ("OSHA") raising her concerns about the potential lead content in American Bronze's products. (Doc. 1, ¶ 12; Doc. 24, p. 15). Two days later, American Bronze fired her. (Doc. 1, ¶ 14; Doc. 17, ¶ 14; Doc. 22, p. 3). Plaintiff, the Secretary of Labor (the "Secretary"), alleges that American Bronze fired

---

[1] Specific written objections to this report and recommendation may be filed in accordance with 28 U.S.C. § 636, and M.D. Fla. R. 6.02, within fourteen (14) days after service of this report and recommendation. Failure to file timely objections shall bar the party from a de novo determination by a district judge and from attacking factual findings on appeal.

Kalinowski because her supervisors suspected she was responsible for the complaint. (Doc. 1 ¶ 17). The Secretary brings this claim under Section 11(c)(1) of the Occupational Safety and Health Act of 1970, 29 U.S.C. § 651. Defendants, American Bronze and its president, vice president, and office manager, all insist that Kalinowski was fired because of her habitual absenteeism and mismanagement of the company website. (Doc. 24, p. 2-3).

The day she was fired, Kalinowski filed a complaint with OSHA alleging that she was discharged "in reprisal for voicing concerns regarding lead exposure in the workplace and for being suspected of causing an OSHA investigation." (Doc. 22, p. 15). OSHA notified American Bronze of the complaint on April 14, 2010. (Doc. 22-3).

On August 12, American Bronze received a letter from OSHA stating that the case was reassigned to Investigator Antoine Robinson. (Doc. 22-6). On August 31, American Bronze sent a letter to Robinson explaining its position and indicating its willingness to settle the case for $2,000. (Doc. 22-7). The following afternoon, Robinson sent Charlie Wambold, American Bronze's President, and Jenny Schiffermiller, American Bronze's Office Manager, an email explaining what the Secretary would have to prove if she filed a claim as well as what damages might be awarded if the Secretary prevailed. (Doc. 22-8). Robinson also suggested that he could convince Kalinowski to settle the case for $6,000. (Id.)

Later that afternoon, Robinson sent an email to Wambold and Schiffermiller, telling them "Mrs. Smith just called back and said she would accept $4,000 and not come back to work." (Doc. 22-9). The next day (September 2), Schiffermiller replied that "Charlie has agreed to her counter offer provided that she sign the Settlement Agreement and the General Release and Disclaimer," and inquiring about how and when payment was to be

made.  (Doc. 22-10).  Robinson responded and attached a Settlement Agreement ("Agreement") and Agreement, General Release and Disclaimer ("Release") to his email. (Doc. 22-11).  He said "if there are any requested changes," then he would have to "go through [OSHA] attorneys" to get approval. (Id.)  Finally, Robinson suggested that he would "bring it by at 4:00 pm tomorrow to have it signed."  (Id.)  Wambold signed[2] the Agreement and Release on behalf of American Bronze and returned them to OSHA. (Doc. 22-12).

On September 13, Robinson emailed Wambold and Schiffermiller that Kalinowski wanted the Defendants not to withhold taxes from the settlement payments and to provide her with a neutral employment reference,

> "just outlining her job responsibilities, how long she worked for the company, and what her job title was. Part of our settlement is that her employment file would not mention this OSHA Complaint. I've spoken to you that I don't agree with her actual termination, so I contend that a neutral reference would be a good thing to provide. This is something that I can generate and send to you, I'm not wanting her to look like a star just a neutral reference. Call me back when you have an opportunity if you have any questions about these items. If you're in agreement she is in agreement, I can get her to sign the papers immediately so there is no more waffling on her part. Thank you for your time."

(Id.).

Defendants agreed to these additional terms. (Doc. 22, p. 6).  On September 14, Robinson sent an email to Wambold offering a "reference example" of a neutral employment reference, which Defendants apparently found acceptable. (Doc. 22, p. 6 n. 6; Doc. 22-15).

Four weeks later, Schiffermiller emailed Robinson inquiring about the status of negotiations.  Robinson replied that Kalinowski "will not agree to the settlement amount

---

[2] Perhaps by mistake, Wambold dated the copy of the Release he signed "9-1-10."

- 3 -

without the reference she wants."³ (Doc. 22-17). Robinson also indicated that his supervisors were unwilling to approve a settlement for so small a sum. (Id.)

Negotiations fell apart and on July 16, 2012, Plaintiff filed this suit. (Doc. 1). Defendants have denied liability and raised nine affirmative defenses. (Doc. 17). On August 20, 2013, Defendants filed this motion seeking to enforce what they contend was a binding settlement agreement between them, the Secretary, and Kalinowski. (Doc. 22). Defendants also seek to recover their attorney's fees. (Id.). The Secretary opposes the motion, denies the formation of a contract, and asserts that Robinson lacked authority to settle the dispute. (Doc. 24).

## II. Discussion

A. Formation of a Contract

The parties agree that Florida law governs the question of whether the parties entered into an enforceable contract. (Doc. 22, p. 8; Doc. 24 p. 5); Schwartz v. Florida Bd. of Regents, 807 F.2d 901, 905 (11th Cir. 1987). Florida law requires mutual assent to form a contract. Gibson v. Courtois, 549 So. 2d 459, 460 (Fla. 1989). All parties must manifest their assent to every essential term. LSQ Funding Group, L.C. v. EDS Field Servs., 879 F. Supp. 2d 1320, 1327 (M.D.Fla. 2012) (citing Knowling v. Manavoglu, 73 So. 3d 301, 303 (Fla. 5th DCA 2011)). Mutual assent does not require a literal or subjective "meeting of the minds," but only a meeting of words and actions. Blackhawk Heating & Plumbing Co. v. Data Lease Financial Corp., 302 So. 2d 404, 407 (Fla. 1974). Usually, though not always, one party manifests assent by making an offer, and the other

---

³ Kalinowski insisted on a gushing write-up praising, among other things, her "excellent written and verbal communication skills," "extreme organiz[ation]," and "acquired time management skills." (Doc. 22-14).

- 4 -

party (or parties) manifest assent by accepting that offer.  Restatement (Second) Contracts § 22.

Defendants argue that Robinson's September 1 email to Schiffermiller and Wambold stating that Kalinowski "just called back and said she would accept $4,000 and not come back to work" constituted an offer, which they accepted in Schiffermiller's September 2 email stating, "Charlie has agreed to her counter offer provided that she sign the Settlement Agreement and the General Release and Disclaimer."  (Doc 22, p. 5; Docs. 22-9, 22-10).  The Secretary argues that Schiffermiller's September 2 email was a counteroffer rather than an acceptance. (Doc. 24, p. 6).

An expression of acceptance conditioned on the occurrence of a certain event, such as a party's agreement to additional terms, is a counteroffer, not an acceptance. Webster Lumber Co. v. Lincoln, 115 So. 498, 504 (Fla. 1927). Schiffermiller's email purports to "agree[]" to Kalinowksi's offer "provided that" Kalinowski sign the Agreement and Release.  The "acceptance" by its terms limits its effectiveness to Kalinowski's agreeing to sign the Agreement and Release and is therefore not an acceptance but a counteroffer that Kalinowski and the Secretary needed to accept for it to be effective.  The evidence is not sufficient to conclude that Kalinowski manifested assent to this additional term before she proposed her own modifications to the deal.

While the evidence of a contract formed on September 2 is thin, the evidence that a contract was formed on September 13 is more substantial.  That day, Robinson sent Schiffermiller and Wambold an email indicating that "in order to settle the case," they would have to agree to pay Kalinowski the full $4,000 without withholding taxes, and they would have to provide Kalinowski with a "neutral employment reference." (Doc. 22-13).  In this message, Robinson also stated that "[i]f you're in agreement[,] she is in agreement."

(Id.). Defendants' memorandum in support of their motion suggests that they agreed to these terms. (Doc. 22, p. 6). Robinson's email the next day inquiring about the timing of payments and particular language for the neutral employment reference corroborates Defendants' contention that they accepted these terms. (Doc. 22-15). Subsequent disagreement over the language of the neutral employment reference does not require a different conclusion. Robinson's demand (on Smith's behalf) for a "neutral employment reference" indicating job title, responsibilities, and duration of employment was not vague or indefinite.

The Secretary argues that no contract was formed because the parties failed to execute a written agreement. (Doc. 24, pp. 6–7). If parties do not intend to be bound until a formal, written contract is signed, then there is no binding agreement unless and until the written contract is executed. Lifecare Int'l, Inc. v. CD Medical, Inc., 68 F.3d 429, 436 (11th Cir. 1995) (applying Florida law). The fact that the parties here intended to reduce their agreement to writing does not mean that they did not intend for their prior statements to be binding. Id. As another court aptly observed, sometimes, "[a] writing may be nothing more than a post hoc memorialization of an already existing . . . agreement." Maine Surgical Supply Co. v. Intermedics Orthopedics, Inc., 756 F. Supp. 597, 602 (D. Me. 1991).

It is not "clear" (Doc. 24, p. 8), that Defendants and Kalinowski did not intend for their statements to Robinson during settlement negotiations to bind them. As "objective evidence" of its own intent, the Secretary points to its Whistleblower Investigations Manual,[4] which requires that all Agreements must be in writing, contain certain core

---

[4] United States Department of Labor, Whistleblower Investigations Manual, Directive No. CPL 02-0-92, August 22, 2003, available at https://www.osha.gov/OshDoc/Directive_pdf/DIS_0-0_9.pdf (hereinafter "OSHA Manual"). Both Plaintiff and Defendant have included parts of the Whistleblower Investigations

- 6 -

elements, and be approved by a supervisor. (Doc. 24, p. 8). There is no evidence that OSHA manifested any such intention to the other parties to the negotiation, and OSHA's "subjective intent is not material in determining whether a contract was made." Med-Star Cent., Inc. v. Psychiatric Hosp. of Hernando Cnty., Inc., 639 So. 2d 636, 637 (Fla. App. 5th Dist. 1994).

B. Robinson's Authority to Agree to the Contract

Defendants' argument nevertheless fails because Robinson lacked authority to settle the claim on the Secretary's behalf. Generally speaking, a principal is bound by the acts of its agent acting under both actual and apparent authority. Stiles v. Gordon Land Co., 44 So. 2d 417, 421 (Fla. 1950). The federal government, however, is bound only by its agents when those agents have actual authority. See H. Landau & Co. v. United States, 886 F.2d 322, 324 (Fed. Cir. 1989). Actual authority is the authority a principal actually confers on the agent, either expressly or by implication. See Restatement (Third) Agency § 2.01 ("An agent acts with actual authority when . . . the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act."). Apparent authority, on the other hand, is authority that the principal causes third parties to reasonably believe an agent has to act on the principal's behalf. See Restatement (Third) Agency § 2.03.

Here, the evidence shows that Robinson lacked authority to settle the case on the Secretary's behalf. The OSHA manual confers the authority to "approve settlement of complaints filed under various whistleblower statutes" and expressly provides that "[t]his

---

Manual as exhibits in support of their respective positions. (Doc. 22-4; Doc. 24, p. 19-30). I find that the contents of the manual as it existed in 2010 can be accurately and readily determined from the pdf file on the OSHA website and that the accuracy of the file, as a statement of the contents of the manual as it existed in 2010, cannot reasonably be questioned. Fed. R. Evid. 201(b)(2). Accordingly, I take judicial notice of the entire manual. Fed. R. Evid. 201(c)(1).

authority may be re-delegated, but no lower than the Assistant Regional Administrator or Area Director level." (OSHA Manual, p. 1-2). Later, the manual states that even privately-negotiated settlements must "be reviewed and approved by the Supervisor to ensure that the terms of the settlement are consistent with the purpose and intent of the Act." (OSHA Manual, p. 6-1). The Agreement Robinsons provided to Defendants contained a signature line for Area Director Leslie L. Grove III; not Robinson. (Doc. 22-11). This is consistent with Robinson's lack of authority to bind the Government. Finally, a declaration by Anthony Rosa, an Assistant Regional Administrator for Whistleblower Protection at OSHA, confirms that Robinson lacked authority to settle. (Doc. 24, pp. 17-18).

Nothing Defendants point to alters this conclusion. OSHA's instruction that Defendants make "all communications and submissions" to Robinson and contact him "on all issues relative to" the case indicates only that Robinson would be the point of contact inside the agency for Defendants; not that Robinson had authority to settle the dispute. (Doc. 22, p. 10). This may seem unfair, and perhaps it is. But "[p]ersons dealing with a governmental agent must take notice of the agent's authority and that any unauthorized acts taken by the agent do not bind the government." United States v. Killough, 848 F.2d 1523, 1526 (11th Cir. 1988). Robinson lacked authority to settle, and the Secretary is not bound by any agreement he purportedly made on the Secretary's behalf. For these reasons, Defendants are not entitled to enforcement of the Agreement.

## I. Recommendation

Upon consideration of the foregoing, I respectfully recommend that Defendants' Motion to Enforce Settlement and for Sanctions be **DENIED** in its entirety.

**RESPECTFULLY RECOMMENDED** at Orlando, Florida on September 17, 2013.

THOMAS B. SMITH
United States Magistrate Judge

Copies furnished to:

    Presiding United States District Judge
    Counsel of Record
    Any Unrepresented Parties